Exhibit 1

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
**Nov 15 2018 01:31PM**
**Ricci Dehl**

Graham F. Baird, Esquire
Attorney ID No: 92692
**THE LAW OFFICES OF ERIC A. SHORE**
Two Penn Center #1240
1500 JFK Boulevard
Philadelphia PA  19102
267.546.0131

Attorneys for Plaintiff, Ryne Christian

| | |
|---|---|
| RYNE CHRISTIAN<br>2726 Royal Road<br>Lancaster, PA  17603 | **CI-18-09892**<br>COURT OF COMMON PLEAS<br>LANCASTER COUNTY |
| Plaintiff | JURY OF TWELVE DEMANDED |
| v. | No.: |
| HIGHMARK, INC.<br>1800 Center Street<br>Camp Hill, PA 17011 | |
| And | |
| THE LANCASTER GENERAL HOSPITAL<br>555 North Duke Street<br>Lancaster, PA 17604 | |
| And | |
| THE LANCASTER GENERAL<br>HOSPITAL FOUNDATION<br>555 North Duke Street<br>Lancaster, PA 17604 | |
| Defendants | |

## CIVIL ACTION COMPLAINT

### I. Parties and Reasons for Jurisdiction.

1.     Plaintiff, Ryne Christian (hereinafter "Plaintiff") is an adult individual residing at

the above address.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
**Nov 15 2018 01:31PM**
Ricci Piehl

2.      Defendant, Highmark, Inc. (hereinafter "Highmark"), is a corporation organized by and operating under the laws of the Commonwealth of Pennsylvania and having principal place of business at the above captioned address. Defendant is a citizen of the Commonwealth of Pennsylvania.

3.      Defendant, The Lancaster General Hospital (hereinafter "LGH"), is a corporation organized by and operating under the laws of the Commonwealth of Pennsylvania and having

**CI-18-09892**

principal place of business at the above captioned address. Defendant is a citizen of the Commonwealth of Pennsylvania.

4.      Defendant, The Lancaster General Hospital Foundation (hereinafter "LGHF"), is a corporation organized by and operating under the laws of the Commonwealth of Pennsylvania and having principal place of business at the above captioned address. Defendant is a citizen of the Commonwealth of Pennsylvania.

5.      The foregoing Defendants, Highmark, Inc., The Lancaster General Hospital Foundation and The Lancaster General Hospital shall all be referred to collectively herein as "Defendants."

6.      This action is instituted pursuant to Pennsylvania law.

7.      The causes of action in this matter, as stated more fully herein, all arose from within the geographical boundary of Lancaster County, Pennsylvania. Furthermore, the Plaintiff and certain Defendants reside in Lancaster County. Thus, pursuant to Pa.R.Civ.P. 1006, venue and jurisdiction appropriately lie with this Court. .

**II. Operative Facts.**

10.     In August 2016, Christian sought treatment at the emergency department of a local hospital for an infection in his leg and a high fever. While being treated for those

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
**Nov 15 2018 01:31PM**
Bucci Dehl

conditions, his treating physicians performed an ECG scan of Christian's heart. The scan revealed serious abnormalities in Christian's cardiac rhythm.

11.      In August 2016, Mr. Christian was an insured under a medical insurance plan provided by Defendant Highmark to Mr. Christian through his employer, The Mennonite Home.

12.      Soon after his emergency department visit, Christian's physicians discovered a potentially serious problem with his heart and he would be examined by specialist to ascertain a **CI-18-09892** diagnosis and undergoing appropriate treatment.

13.      During the months of September, October, and November 2016, Christian visited cardiac specialists to determine the true nature of his diagnosis.

14.      In late November or early December 2016, Christian received his definitive diagnosis. His physicians determined that Christian had a serious heart condition called Brugada Syndrome ("Cardiac Disorder").

15.      The Cardiac Disorder causes a disruption of the heart's normal rhythm. It can lead to irregular heartbeats in the heart's ventricles—an abnormality called ventricular arrhythmia. If untreated, the irregular heartbeats can cause fainting, seizures, difficulty breathing, or sudden death. The implantation of an automatic implantable cardioverter-defibrillator (ICD) is the only treatment proved effective in treating ventricular tachycardia and fibrillation and preventing sudden death in patients with this Cardiac Disorder.

16.      In December 2016, Christian's surgeons by and on behalf of Defendants LGH and LGHF sought to treat his Cardiac Disorder by implanting an ICD in his chest.

17.      In preparation for the surgical procedure, on or about December 7, 2016, representatives of Defendants contacted Plaintiff to advise him that he was covered for the surgery.

3

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Nov 15 2018 01:31PM
Ripp Pehl

18.     Defendant, Highmark notified Defendants, LGH and LGHF that it had ripped coverage for the ICD surgery.

19.     On December 8, 2016, Defendant suspended Christian. On December 9, 2016, Defendant terminated Christian.

20.     Defendants LGH and LGHF performed surgery upon Plaintiff Christian to implant the ICD in his chest in mid-December 2016, on or about December 14, 2016.

**CI-18-09892**

21.     In or around mid January, 2017, Defendants sent and Plaintiff received a bill for the surgery in the amount of $108,000.

22.     In the time leading up to the surgery, Plaintiff could and would have delayed the surgery had he known that the surgery would be uncovered by Defendant, Highmark.

23.     Consequently, Christian has incurred out-of-pocket medical expenses in excess of $100,000 for the ICD implant surgery and related treatment.

24.     Christian's medical care went uncovered despite Defendants' statements to Plaintiff advising him that he was in fact covered for the surgery should he move forward with it.

25.     As a direct and proximate result of Defendants' aforementioned conduct, Christian sustained great economic loss, as well emotional distress, humiliation, pain and suffering and other damages as set forth below.

**III. Causes of Action.**

## COUNT I
## PENNSYLVANIA STATE LAW CLAIM
### (Promissory Estoppel)

26.     Plaintiff incorporates paragraphs 1-25 as if fully set forth at length herein.

27.     On or about December 7, 2016, Defendants advised Plaintiff that he would have insurance coverage to pay for his aforementioned ICD implant surgery.

4

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Nov 15 2018 01:31PM
Randy Dehl

28.     Based upon these statements, Mr. Christian consented to be operated upon by Defendants, The Lancaster General Hospital and The Lancaster General Hospital Foundation.

29.     Mr. Christian was unfairly terminated from his employment on or about December 9, 2016.

30.     Mr. Christian was never advised that his medical insurance was terminated prior to undergoing the surgery on or about December 14, 2016.

**CI-18-09892**

31.     At the time of the surgery, Mr. Christian had no knowledge or notice that he was uninsured for the surgery until receiving a bill of well over $100,000 from Defendants and Mr. Christian reasonably relied upon the previous statements of Defendants whereby they advised that he would be insured for the surgery.

32.     As a result of the foregoing, Christian continues to incur substantial medical bills for uncovered medical procedures.

33.     As a proximate result of Defendant's conduct, Plaintiff sustained significant damages, including but not limited to: great economic loss, emotional distress, mental anguish, humiliation, pain and suffering and consequential damages and a claim is made therefore.

34.     As a result of Defendants' conduct, Plaintiff hereby demands punitive and liquidated damages.

35.     Plaintiff also demands attorneys' fees and court costs.

## COUNT II
## ERISA 29 U.S.C. § 1144

36.     Plaintiff incorporates paragraphs 1-35 as if fully set forth at length herein.

37.     At all relevant times during his employment at the Mennonite Home, Plaintiff was entitled to receive, and did receive, various ERISA covered employment benefits, including health insurance coverage.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
**Nov 15 2018 01:31PM**
Ricci Rehl

38.    As an employee of the Mennonite Home, Christian was covered by Mennonite Home's health insurance plan, provided by Defendant Highmark Blue Shield.

39.    As set forth above, Defendants informed Plaintiff his surgery would be covered under his medical insurance plan issued by Defendant, Highmark.

40.    In reliance upon this statement, Plaintiff Christian elected to proceed with his surgery as scheduled.

**CI-18-09892**

41.    Following his surgery, Defendants demanded payment from Christian in an amount in excess of $100,000.

42.    Manifest injustice would result in the event Mr. Christian is required to pay the full amount of the bill.

43.    As such, Defendants are equitably estopped from denying Plaintiff insurance coverage for his aforementioned surgery, and/or demanding payment for said surgery.

44.    As a proximate result of Defendant's conduct, Plaintiff sustained significant damages, including but not limited to: great economic loss, emotional distress, mental anguish, humiliation, pain and suffering and consequential damages and a claim is made therefore.

45.    As a result of Defendants' conduct, Plaintiff hereby demands punitive and liquidated damages.

35.    Plaintiff also demands attorneys' fees and court costs.

**IV.  Relief Requested.**

**WHEREFORE,** Plaintiff Ryne Christian, hereby demands judgment in his favor and against Defendants, Highmark, Inc., The Lancaster General Hospital and The Lancaster General Hospital Foundation, jointly and severally, in an amount in excess of $150,000.00 together with:

6

ORDERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
**Nov 15 2018 01:31PM**
Ricci Dehl

A.   Compensatory damages, including but not limited to: back pay, front pay, past lost

wages, future lost wages, lost pay increases, lost pay incentives, lost opportunity, lost

benefits, lost future earning capacity, injury to reputation, mental and emotional

distress, pain and suffering

B.   Punitive damages;

C.   Attorneys fees and costs of suit;

D.   Interest, delay damages; and,

E.   Any other further relief this Court deems just proper and equitable.

CI-18-09892

LAW OFFICES OF ERIC A. SHORE, P.C.

BY:   _____

**GRAHAM F. BAIRD, ESQUIRE**
Two Penn Center
1500 JFK Boulevard, Suite 1240
Philadelphia, PA 19102
Phone: (267) 546-0124
Fax: (215) 944-6124

Attorney for Plaintiff, Ryne Christian

Date:   __November 14, 2018__

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Nov 15 2018 01:31PM
Ricci Dehl

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.   Cover Sheet**

(a)(1)  This rule shall apply to all actions governed by the rules of civil procedure except the following:

CI-18-09892

(i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii)     actions for support, Rules 1910.1 et seq.

(iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Nov 15 2018 01:31PM
Ricci Dehl

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ Lancaster _____ **County**

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: Ryne Christian | Lead Defendant's Name: Highmark, Inc. |
|---|---|

**CI-18-09892**

Are money damages requested? ☒ Yes ☐ No

Dollar Amount Requested: (check one)
☐ within arbitration limits
☒ outside arbitration limits

Is this a *Class Action Suit?* ☐ Yes ☒ No     Is this an *MDJ Appeal?* ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: Graham F. Baird, Esq.

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE.* If you are making more than one type of claim, check the one that you consider most important.

**SECTION B**

**TORT** (*do not include Mass Tort*)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (*does not include mass tort*)
- ☐ Slander/Libel/ Defamation
- ☐ Other:

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** (*do not include Judgments*)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☒ Other: PROMMISORY ESTOPPEL

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

Exhibit 2

# PPO BLUE

PPO PROGRAM

**The Mennonite Home**
**Groups 25375-90, 91**
**Effective July 1, 2016**
**Produced July, 2016**



HIGHMARK. | PPO Blue

# Table of Contents

**Introduction to Your PPO Blue Program** ............................................................................... 1
**How Your Benefits Are Applied** ........................................................................................ 3
  Benefit Period ................................................................................................................ 3
  Medical Cost-Sharing Provisions ..................................................................................... 3
  Prescription Drug Cost-Sharing Provisions ...................................................................... 5
**Summary of Benefits** ....................................................................................................... 6
**Covered Services - Medical Program** .............................................................................. 12
  Ambulance Service ....................................................................................................... 12
  Anesthesia for Non-Covered Dental Procedures (Limited) ................................................ 12
  Diabetes Treatment ...................................................................................................... 13
  Diagnostic Services ...................................................................................................... 13
  Durable Medical Equipment .......................................................................................... 14
  Enteral Foods .............................................................................................................. 14
  Home Health Care Services ........................................................................................... 15
  Home Infusion and Suite Infusion Therapy Services ........................................................ 16
  Hospice Care Services .................................................................................................. 16
  Hospital Services ......................................................................................................... 17
  Emergency Care Services .............................................................................................. 18
  Maternity Services ....................................................................................................... 19
  Medical Services .......................................................................................................... 20
  Mental Health Care Services .......................................................................................... 22
  Orthotic Devices .......................................................................................................... 23
  Preventive Care Services ............................................................................................... 23
  Private Duty Nursing Services ........................................................................................ 25
  Prosthetic Appliances ................................................................................................... 26
  Skilled Nursing Facility Services ..................................................................................... 26
  Spinal Manipulations .................................................................................................... 26
  Substance Abuse Services ............................................................................................. 26
  Surgical Services .......................................................................................................... 27
  Therapy and Rehabilitation Services .............................................................................. 29
  Transplant Services ...................................................................................................... 30
**Covered Services - Prescription Drug Program** ............................................................... 31
  Covered Drugs – Incentive Formulary ............................................................................ 31
**What Is Not Covered** .................................................................................................... 33
**How PPO Blue Works** ................................................................................................... 40
  Network Care .............................................................................................................. 40
  Out-of-Network Care .................................................................................................... 40
  Out-of-Area Care ......................................................................................................... 41
  Inter-Plan Programs ..................................................................................................... 41
  The BlueCard Worldwide Program .................................................................................. 43
  Your Provider Network ................................................................................................. 44
  How to Get Your Physicians' Professional Qualifications ................................................... 45
  Eligible Providers ......................................................................................................... 45
  Network Pharmacies .................................................................................................... 46

**Healthcare Management**..........................................................................................................**49**
   Medical Management............................................................................................................49
   Care Utilization Review Process ............................................................................................50
   Prescription Drug Management ............................................................................................52
   Precertification, Preauthorization and Pre-Service Claims Review Processes ...............................53
**General Information** ..............................................................................................................**56**
   Who is Eligible for Coverage.................................................................................................56
   Changes in Membership Status ............................................................................................57
   Medicare ...........................................................................................................................58
   Leave of Absence or Layoff ..................................................................................................58
   Continuation of Coverage....................................................................................................58
   Conversion .........................................................................................................................59
   Termination of Your Coverage Under the Employer Contract......................................................59
   Coordination of Benefits......................................................................................................59
   Subrogation .......................................................................................................................60
**A Recognized Identification Card** ..........................................................................................**62**
**How to File a Claim** ...............................................................................................................**63**
   Your Plan Activity Statement................................................................................................64
   How to Voice a Complaint ....................................................................................................65
   Additional Information on How to File a Claim..........................................................................66
   Determinations on Benefit Claims ........................................................................................67
   Appeal Procedure ...............................................................................................................67
**Member Service** ..................................................................................................................**76**
   Blues On Call .....................................................................................................................76
   myCare Navigator ...............................................................................................................77
   Highmark Website ..............................................................................................................77
   Baby Blueprints..................................................................................................................78
   Member Service .................................................................................................................78
**Member Rights and Responsibilities** ....................................................................................**80**
   How We Protect Your Right to Confidentiality .........................................................................80
**Terms You Should Know** .......................................................................................................**82**
**Consent Decree Addendum** ..................................................................................................**89**
**Notice of Privacy Practices** ..................................................................................................**91**

### Disclosure

*Your health benefits are entirely funded by your employer. Highmark Blue Shield provides administrative and claims payment services only.*

# Introduction to Your PPO Blue℠ Program

This booklet provides you with the information you need to understand your PPO Blue program offered by your group. We encourage you to take the time to review this information so you understand how your health care program works.

For a number of reasons, we think you'll be pleased with your health care program:

- *Your PPO Blue program gives you freedom of choice.* You are not required to select a primary care physician to receive covered care. You have access to a large provider network of physicians, hospitals, and other providers in Central Pennsylvania and the Lehigh Valley, as well as providers across the country who are part of the local Blue Cross and Blue Shield PPO network. For a higher level of coverage, you need to receive care from one of these network providers. However, you can go outside the network and still receive care at the lower level of coverage.  To locate a network provider near you, or to learn whether your current physician is in the network, log onto your Highmark member website, www.highmarkblueshield.com.

- *Your PPO Blue program gives you "stay healthy" care.* You are covered for a range of preventive care, including physical examinations and selected diagnostic tests. Preventive care is a proactive approach to health management that can help you stay on top of your health status and prevent more serious, costly care down the road.

You can review your Preventive Care Guidelines online at your member website. And, as a member of your PPO Blue program, you get important extras. Along with 24-hour assistance with any health care question via Blues On Call, your member website connects you to a range of self-service tools that can help you manage your coverage. You can also access programs and services designed to help you make and maintain healthy improvements. And you can access a wide range of care cost and care provider quality tools to assure you spend your health care dollars wisely.

We understand that prescription drug coverage is of particular concern to our members. You'll find in-depth information on these benefits in this booklet.

If you have any questions on your PPO Blue program please call the Member Service toll-free telephone number on the back of your ID card. For TTY/TDD hearing impaired service, please dial 711 and the number on the back of your ID card.

## *Information for Non-English-Speaking Members*

Non-English-speaking members have access to clear benefits information. They can call the toll-free Member Service telephone number on the back of their ID card to be connected to a language services interpreter line. Highmark Member Service representatives are trained to make the connection.

As always, we value you as a member, look forward to providing your coverage, and wish you good health.

to anyone who has elected continued coverage through your employer's program and the term of that coverage has expired.

If your coverage through your employer is discontinued for any reason, except as specified below, you may be able to convert to a direct payment program.

The conversion opportunity is not available if either of the following applies:

- You are eligible for another group health care benefits program through your place of employment.
- When your employer's program is terminated and replaced by another health care benefits program.

## Termination of Your Coverage Under the Employer Contract

Your coverage will be terminated when you cease to be eligible to participate under your group health plan in accordance with its terms and conditions for eligibility.

## Coordination of Benefits

Most health care programs, including your PPO Blue program, contain a coordination of benefits provision. This provision is used when you, your spouse or your covered dependents are eligible for payment under more than one health care plan. The object of coordination of benefits is to ensure that your covered expenses will be paid, while preventing duplicate benefit payments.

Here is how the coordination of benefits provision works:

- When your other coverage does not mention "coordination of benefits," then that coverage pays first. Benefits paid or payable by the other coverage will be taken into account in determining if additional benefit payments can be made under your plan.
- When the person who received care is covered as an employee under one contract, and as a dependent under another, then the employee coverage pays first.
- When a dependent child is covered under two contracts, the contract covering the parent whose birthday falls earlier in the calendar year pays first. But, if both parents have the same birthday, the plan which covered the parent longer will be the primary plan. If the dependent child's parents are separated or divorced, the following applies:

59

**IN WITNESS WHEREOF**, the parties have caused this Agreement and its Exhibits to be executed by their duly authorized representatives.

**THE MENNONITE HOME**
**(A Participant in the Retirement**
**Community Health Plan of PA)**

BY: _John D. Sauder_
John D. Sauder (Aug 31, 2017)

NAME: John D. Sauder

TITLE: President

DATE: Aug 31, 2017

**HIGHMARK INC.**

BY: _Anthony Benevento_

NAME: Anthony Benevento

TITLE: Senior Vice President, Regional Markets

DATE: Sep 1, 2017

34

Exhibit 3

*This Agreement is Confidential and Proprietary, and may not be disclosed to any third party without the prior written consent of Highmark Inc.. Only a hard copy of this document issued by Highmark will be accepted as the parties' final and binding Agreement.*

## ADMINISTRATIVE SERVICES ONLY AGREEMENT

For

# The Mennonite Home
# (A Participant in the Retirement Community Health Plan of PA)

Client Number - 126221

Group Numbers - See Exhibit A

And

## Highmark Inc. d/b/a Highmark Blue Shield*

### *An Independent Licensee of the Blue Cross and Blue Shield Association

## TABLE OF CONTENTS

SECTION 1 – DEFINITIONS.................................................................................. 1

SECTION 2 – TERM ........................................................................................... 4

SECTION 3 – SCOPE OF UNDERTAKING ................................................ 4

SECTION 4 – PLAN DESIGN AND AMENDMENTS.................................... 5

SECTION 5 – ELIGIBILITY AND ENROLLMENT ....................................... 7

SECTION 6 – SPONSOR/PLAN ADMINISTRATOR RESPONSIBILITIES................. 8

SECTION 7 – CLAIMS ADMINISTRATOR RESPONSIBILITIES ............................ 10

SECTION 8 – TERMINATION OF AGREEMENT...................................... 17

SECTION 9 – AUDIT ....................................................................................... 18

SECTION 10 – CONFIDENTIALITY AND PRIVACY LAWS ......................................... 20

SECTION 11 – PLAN BENEFITS LITIGATION............................................................. 23

SECTION 12 – BLUECARD® PROGRAM................................................................ 24

SECTION 13 – CONSORTIUM HEALTH PLANS ......................................................... 31

SECTION 14 – MISCELLANEOUS PROVISIONS ....................................................... 31

EXHIBIT A – GROUP NUMBERS ............................................................................. 35

EXHIBIT B – PAYMENT FOR PLAN BENEFITS AND ADMINISTRATIVE FEES.... 36

EXHIBIT C – BUSINESS ASSOCIATE ADDENDUM................................................. 40

EXHIBIT D – eDELIVERY ADDENDUM..................................................................... 49

EXHIBIT E – PHARMACY ADDENDUM .................................................................... 53

126221
Print date: September 26, 2016
PPO Program

## AGREEMENT

This Administrative Services Only Agreement ("Agreement"), effective **July 1, 2016** ("Effective Date"), is by and between **The Mennonite Home,** a Participant in the Retirement Community Health Plan of PA, and Highmark Inc. d/b/a Highmark Blue Shield.  In order to be a participant of the Retirement Community Health Plan of PA, The Mennonite Home, must continue to comply with the requirements set forth in the Retirement Community Health Plan of PA By-Laws and Participation Agreement.

### Section 1 – Definitions

For purposes of this Agreement, the following words and phrases have the meanings set forth below, unless the context clearly indicates otherwise.  Wherever appropriate, the singular shall include the plural and the plural shall include the singular. Capitalized terms used in this Agreement, unless otherwise defined herein, shall have the meanings assigned to them in the Benefits Booklet, PPACA, HIPAA or ERISA.

1.1 **Administrative Fees** means the amount(s) specified in Exhibit B that Plan Sponsor agrees to pay Claims Administrator in exchange for Claims Administrator's performance of its obligations under this Agreement. The parties may agree in writing to amend the Administrative Fees specified in Exhibit B from time to time, and each such amendment shall be incorporated into Exhibit B as if fully set forth therein.

1.2 **Benefits** means the care, treatment, services and supplies described in the Benefits Booklet which are eligible for payment or reimbursement by the Plan.

1.3 **Benefits Booklet** refers to the document under which Benefits will be administered pursuant to this Agreement, and is incorporated herein by reference.

1.4 **Claim** means the amount a Provider, Member or vendor requests from the Plan for payment or reimbursement of a treatment, service or supply. "Claim" does not include any of the following: casual inquiries; requests for advance information on coverage when prior authorization is not required; benefits or services received directly from a Network Provider, including a pharmacy, until and unless the Claim has been received for processing; transactions between Claims Administrator and a Network Provider where the Member is not liable for any charges.

1.5 **Claims Administrator** means Highmark Inc. d/b/a Highmark Blue Shield.

1

1.6 **Contractholder** means an employee or retiree and his/her dependents: (a) collectively, if each is enrolled under the same group number; and (b) individually, if the employee or retiree and his/her dependents are enrolled under separate group numbers.

1.7 **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, and regulations implemented there under.

1.8 **HIPAA** means the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations implemented thereunder; including, but not limited to, HIPAA privacy standards ("Privacy Rule"), transaction standards ("Transactions Rule") and security standards ("Security Rule").

1.9 **Member** means any individual who is enrolled in the Plan. Members shall be deemed to be Claims Administrator subscribers, and any reference to "subscribers" in any agreement, regulation or policy adopted by Claims Administrator shall be deemed to apply to Members.

1.10 **Network Provider** means any Provider that is included within the network of Providers described in the Benefits Booklet.

1.11 **Paid Claim** refers to the amount charged to Plan Sponsor for Benefits provided to Members during the term of this agreement. In addition, the amount of a Paid Claim shall be determined as follows:

(a) Except as otherwise provided in this Agreement, Paid Claims shall mean the amount Claims Administrator actually pays to a Provider without regard to: (i) whether Claims Administrator reimburses such Provider on a percentage of charge basis, a fixed payment basis, a global fee basis, single case rate or other reimbursement methodology; (ii) whether such amount is more or less than the Provider's actual billed charges for a particular service, supply or treatment; or (iii) whether such payments are increased or decreased by the Provider's achievement of, or failure to achieve, certain specified goals, outcomes or standards adopted by Claims Administrator.

(b) If a Provider or vendor participates in any of Claims Administrator's payment innovation programs in which performance incentives, rewards or bonuses are paid based on the achievement of cost, quality, efficiency or service standards or metrics adopted by Claims Administrator ("Payment Innovation Programs"), Paid Claims shall also include the amount of such payments to Providers or vendors for these Payment Innovation Programs. Such payments may be charged to Plan Sponsor on a per Claim, lump sum, or per Member basis and shall be calculated based on Claims Administrator's predetermined methodology for such Payment Innovation Program, as may be amended from time to time. The total monies charged in advance to fund

2

a Payment Innovation Program shall be actuarially determined as the amount necessary to fund the expected payments attributable to the Payment Innovation Program. Prior to its implementation, Claims Administrator shall provide Plan Sponsor with a description of the Payment Innovation Program, the methodology that will be utilized to charge Plan Sponsor, and any reconciliation process performed in connection with such program. Payments to Providers or vendors under these Payment Innovation Programs shall not impact Member cost shares.

(c) Paid Claims may also include fees paid to Providers or vendors for managing and/or coordinating the care or cost of care for designated Members.

1.12 **Participating Provider** means any Provider with whom any Blue Cross and/or Blue Shield licensee has a contract with respect to payment for services performed for persons enrolled in any Blue Cross or Blue Shield health care program or a health care program administered by a Blue Cross and/or Blue Shield licensee.

1.13 **PHI** means "Protected Health Information," as that term is defined in the Privacy Rule.

1.14 **Plan** means the provisions of the group health plan established by Plan Sponsor, including any amendments thereto, that are administered by Claims Administrator under this Agreement.

1.15 **Plan Sponsor** or **Group** refers to the entity identified on the cover page of this Agreement. Unless otherwise indicated in this Agreement, the Plan Sponsor shall be deemed to be the Plan administrator. Claims Administrator shall not be considered to be the Plan administrator except to the extent that Claims Administrator has accepted fiduciary responsibility for a Plan administrative function under this Agreement.

1.16 **PPACA** means the Patient Protection and Affordable Health Care Act of 2010 and implementing regulations thereunder; including, but not limited to, rules relating to internal Claims and appeals and external review processes under PPACA ("PPACA Claim Rule").

1.17 **Provider** refers to any duly licensed and approved health care facility, pharmacy or health care professional for whose services the Plan Sponsor is obligated to pay under the terms of the Benefits Booklet.

1.18 **Summary Plan Description** means a document prepared by Plan Sponsor or its designee, that satisfies the requirements of ERISA § 102 and regulations implemented thereunder.

126221

1.19  **Systems** refers to Claims Administrator's information systems (including, but not limited to, its Web-based systems) made available to facilitate the transfer or exchange of information in connection with this Agreement.

## Section 2- Term

2.1  The initial term of this Agreement shall be the twelve (12) month period commencing on the Effective Date. Thereafter, this Agreement shall renew for successive twelve (12) month periods upon the mutual written consent of the parties unless: (a) terminated in  the manner provided in this Agreement; (b) otherwise amended; or (c) Plan Sponsor fails to satisfy Claims Administrator's internal requirements for administrative services only agreements.

## Section 3 – Scope of Undertaking

3.1  Except to the extent this Agreement specifically requires Claims Administrator to have fiduciary responsibility for a Plan administrative function, Plan Sponsor has and retains sole and final authority to control and manage the operation of the Plan to the extent not otherwise delegated herein. Claims Administrator is and shall remain an independent contractor with respect to the services being performed hereunder and shall not for any purpose be deemed an agent, joint venturer, partner or representative of Plan Sponsor. In addition, Claims Administrator shall not be liable for any acts or omissions of Plan Sponsor, its agents or employees or any other person or organization with which Plan Sponsor has made, or hereafter shall make, arrangements for the performance of services under this Agreement.

3.2  Claims Administrator shall provide only administrative Claims payment services under this Agreement, and does not assume any financial risk or obligation with respect to Claims. Benefits are funded entirely by Plan Sponsor.   Claims Administrator shall not be considered an insurer, stop-loss insurer, re-insurer, guarantor or underwriter of any Benefits under the Plan. Plan Sponsor agrees to disclose the foregoing terms of its relationship with Claims Administrator in the Benefits Booklet and/or Summary Plan Description distributed to Members.

3.3  To avoid misunderstandings by third parties concerning the respective duties and obligations of Claims Administrator and Plan Sponsor hereunder, Plan Sponsor agrees not to use Claims Administrator's name in any release or printed form about Claims Administrator's processes or obligations hereunder without Claims Administrator's prior written approval.

3.4  Claims Administrator's obligations to Plan Sponsor and Plan are expressly limited to the terms of this Agreement.  Accordingly, any function not specifically

4

delegated to Claims Administrator pursuant to this Agreement shall remain the sole responsibility of Plan Sponsor.

3.5 Claims Administrator shall serve as a Business Associate of the Plan as that term is defined in the Privacy Rule. Accordingly, Plan Sponsor (individually and on behalf of the Plan) and Claims Administrator agree that this Agreement along with the Business Associate Addendum attached hereto as Exhibit C shall govern Claims Administrator's obligations regarding the use and disclosure of PHI when performing the functions delegated herein.

3.6 Plan Sponsor shall provide Claims Administrator with the names of persons who are authorized ("Authorized Persons") to: (a) give instructions on behalf of the Plan Sponsor and Plan; and   (b) provide documents, materials and other information on behalf of the Plan Sponsor and Plan.  In performing the services under this Agreement, Claims Administrator shall be entitled to rely upon the instructions, documents, materials and other information furnished by the Authorized Persons (or any other person reasonably believed by Claims Administrator as having such authority); whether the instructions, documents, materials and other information is conveyed in writing, by telephone or by other means of electronic communication. Unless Claims Administrator is otherwise instructed by Plan Sponsor in writing, the individuals listed as "Designated Plan Representatives" in Appendix A to the Business Associate Addendum shall be deemed to be Authorized Persons.

### Section 4 – Plan Design and Amendments

4.1 **Plan Benefit Design.**  Plan Sponsor understands and agrees that it retains full responsibility for ensuring that the Plan's design and its governing documents conform to applicable federal and state laws and regulations; including, but not limited to, all matters involving such design.  In this regard, Plan Sponsor shall select and specify to Claims Administrator the services for which Benefits are payable under the Plan.  The Benefits and the terms and conditions under which the Plan shall provide for the same shall be set forth in a Benefits Booklet produced by Claims Administrator. It is understood and agreed by the parties hereto that Claims Administrator shall not be required to conform the Benefits Booklet to any Summary Plan Description derived therefrom or review the same for compliance with ERISA disclosure requirements or other applicable requirements of State or Federal law; and, further, that any such review and compliance shall be the sole responsibility of Plan Sponsor.

Plan Sponsor further acknowledges and agrees that Claims Administrator will administer the Plan in accordance with the definitions and other language contained in the draft version of the Benefits Booklet created when Plan Sponsor

126221

agreed to purchase the services described in this Agreement until such time as Claims Administrator and Plan Sponsor agree on the final terms of a Benefits Booklet. After that agreement is reached, the final version of the Benefit Booklet shall be used by Claims Administrator to administer the Plan. Notwithstanding the preceding, and unless otherwise agreed, the initial draft version of the Benefits Booklet shall be deemed accepted by the parties as the final and binding version if agreement on its final terms is not reached by the one hundred and twentieth (120) day following the Effective Date.

4.2    **Benefits**.   The Benefits available to Members under the Plan shall vary with respect to Copayments, Deductibles, Coinsurance, and levels of payment for specific Benefits depending on whether Members use Network Providers (including Network Providers that participate in a Payment Innovation Program) or use non-network Providers as described in the Benefits Booklet.

4.3    **Plan Amendments.**  Plan Sponsor may amend the Plan to change the Benefits provided to its Members or the eligibility of its Members at any time during the initial term or any extension of this Agreement.  Upon written confirmation to Claims Administrator from Plan Sponsor that the Plan has been duly amended, Claims Administrator shall administer Claims to conform to the amendments to the extent it is administratively feasible to do so.  Plan Sponsor assumes all responsibility for communication of Plan amendments to the Members and Claims Administrator and for other notices to Members as required by ERISA or any other  applicable law.  Notwithstanding the preceding, if any amendment materially changes the scope of the Plan or its administration, or if any amendment increases or decreases Plan Sponsor's anticipated Paid Claims expense or Claims Administrator's administrative services and/or expenses, the parties shall agree to revised terms prior to the administration of the amendments.  If the parties fail to reach an agreement within thirty (30) days of commencement of negotiations, either party may terminate this Agreement by giving sixty (60) days written notice of termination to the other party.  To the extent changes in Benefits necessitate modification or revision of the Benefits Booklet, Plan Sponsor shall provide Claims Administrator not less than ninety (90) days advance written notice of such amendment.

4.4    **Claims  Administrator's  Amendments.**    Notwithstanding  any  provision contained herein to the contrary and for the purpose of: (a) complying with the provisions of any law, lawful order of court or regulatory authority; or (b) maintaining the consistency of Plan administration with the design of like programs administered by Claims Administrator, Claims Administrator, upon giving not less than sixty (60) days prior written notice to Plan Sponsor, shall have the right to amend the Benefits Booklet and this Agreement (including all Exhibits) to the extent necessary to accomplish such purposes. Plan Sponsor also agrees to pay any change in Paid Claims and/or administrative expense which results from such amendment.  If the parties cannot agree to any such

6